. (No. 6664. June 17, 1939.)

C. W. PEARCE, H. A. BERGH and RALPH CALL, Respondents, v. WILLIS C. MOFFATT, as Prosecuting Attorney in and for the County of Ada, State of Idaho, Appellant.

[92 Pac. (2d) 146.]

Willis C. Moffatt and Kenneth W. O'Leary, for Appellant.

J. M. Lampert, for Respondents.

AILSHIE, C. J.—Injunction was sought by respondents to restrain and enjoin appellant from prosecuting them for violating sec. 53–704, I. C. A., which provides:

"It shall be unlawful for any person or persons in the state to keep open for business or to work at the barber's trade in any city of the first or second class after the hour of seven o'clock P. M. on any working day: provided, however, that on Saturday and the day preceding each legal holiday said barber shops may be kept open for business until ten o'clock P. M."

By the same action it was sought to enjoin any prosecution under sec. 9 of Ordinance No. 1704 of Boise City, which provides as follows:

"Sec. 9. It shall be unlawful for any person or persons, firm, or corporation, to operate, maintain, or conduct any barber shop or place wherein barbering is done, in Boise City, Idaho, to be open for the purpose of business of barbering for

revenue, pay, free or otherwise, before eight o'clock A. M. and after six o'clock P. M. on the following days, to-wit: Monday, Tuesday, Wednesday, Thursday, and Friday of each week; on Saturday of each week, said shops or places shall not be open before eight o'clock A. M. or after seven o'clock P. M.

"All barber shops shall remain closed on Sunday and the following holidays, to-wit: New Year's Day, Decoration Day, Fourth of July, Labor Day, Armistice Day, Thanksgiving Day, and Christmas, and when said holidays or any of them fall on Sundays, then the following Monday shall be observed."

The trial court entered judgment for the plaintiffs and issued a perpetual injunction against the prosecution of respondents under either the foregoing statute or the ordinance. This appeal is from the judgment; and the sole question here is whether the statute and ordinance are, or either of them is, unconstitutional.

Upon the oral argument it was stipulated that Kenneth O'Leary should be bound by any decision rendered herein, because of his election as the successor of appellant Moffatt, to the office of prosecuting attorney of Ada county.

There is no longer any difference of opinion among courts as to the power of the legislature over the subjects, business and practices involving the public health, safety, morals and welfare. The statute here involved (sec. 53–704, which is a part of chapter 7 of Title 53), is clearly intended as a legislative exercise of the police power of the state. Section 1 of this chapter declares the legislation therein proposed by the act is, "In the interest of the public health and to prevent the spread of contagious and infectious diseases." Chapter 6 of the same title provides for the registration, examination and licensing of barbers, defines who are barbers, and requires a license for the practice of "barbering" (sec. 53–602). In order to obtain a license for barbering, the applicant must show that he is a graduate of an eighth grade grammar school or its equivalent; and he must have passed a satisfactory examination in a barber school or college or before the department of law enforcement showing a satisfactory knowledge of the

"Scientific fundamentals for barbering; hygiene; bacteriology; histology of the hair, skin, nails, muscles and nerves; structure of the head, face and neck; elementary chemistry relating to sterilization and antiseptics; diseases of the skin, hair, glands and nails; massaging and manipulating the muscles of the upper body; hair cutting; shaving; and arranging, dressing, coloring, bleaching and tinting of the hair." (See, also, sec. 53–606.)

The legislature designates the trade or occupation as the "art or science of barbering" (sec. 53–607). Now, in the light of this act and its requirements, it is at once apparent that the right to practice the "art or science of barbering" is a *privilege* granted by the legislature to those who bring themselves within the terms of the act; and that the people who patronize them have a right to expect and feel assured that the barber holding himself out as such has complied with the requirements of the law and will observe all its sanitary, health and police provisions.

Now after the barber has complied with all those provisions and opened a place for the practice of his "art or science," why may not the legislature, in the further pursuance of its desire and discretion to protect the health and general welfare of the people who may patronize this scientific artist, say to him:

"You are going to have all kinds, classes and ages of people in your shop. Some may be carrying highly contagious diseases. Some may be infected with dangerous bacteria; you will be employed to practice your art on persons in ill health; and at the same time you will not know of this danger to both you and your patrons except as you may discover it from ocular observation. Such persons will not only endanger your health but the health and safety of your other patrons; and in the long run, affect the health, happiness, and welfare of their families.

"We are therefore going to require you to close your shop at a certain hour every successive 24 hours and you and any employees you may have working in your shop may at the same time have rest and recreation, and your shop may be inspected and be given any necessary sanitary treatment.

And we are going to make the same requirement of all persons practicing your art.''

I cannot see any sound reason why the legislature, speaking for the people of the state, may not say as much and write it into a statute. That becomes a condition on which the state issues to this artist his tonsorial license and turns him out to practice his sanitary and soothing art on the public. This ''art or science'' when properly conducted, under modern skill and regulations, is a most desirable, healthful and necessary service and deserves the high respect and commendation which it has been accorded by the legislature of this state, as evidenced by the wholesome and minute provisions of both chapter 6, dealing with registration, examinations and licensing of barbers (secs. 53–601 to 53–625) and chapter 7, dealing with ''Barber Shop Inspection and Closing Hours'' (secs. 53–701 to 53–705).

Furthermore, it is not at all improbable that in the passage of this act the legislature had in mind the public morals, peace and quiet, along with the public health and safety. I am unable to discover anything in the act before us which in principle is out of harmony with an unbroken line of decisions from this court, as well as the highest court of the land, sustaining the constitutionality of similar legislation predicated on like and similar grounds to those above suggested; nor do I see where there is just cause for holding that the regulations prescribed by the act ''arbitrarily interfere with private business.'' I think the legislation embodied in this barbering act is sustained by *Mullen & Co. v. Moseley,* 13 Ida. 457, 90 Pac. 986, 121 Am. St. 277, 13 Ann. Cas. 450, 12 L. R. A., N. S., 394; *State v. Dolan,* 13 Ida. 693, 92 Pac. 995, 14 L. R. A., N. S., 1259; *Chambers v. McCollum,* 47 Ida. 74, 272 Pac. 707; *State v. Cranston,* 59 Ida. 561, 85 Pac. (2d) 682; *In re Hinkle,* 33 Ida. 605, 196 Pac. 1035; and likewise by *West Coast Hotel Co. v. Parrish,* 300 U. S. 379, 57 Sup. Ct. 578, 81 L. ed. 703, 108 A. L. R. 1330; *Nebbia v. New York,* 291 U. S. 502, 503, 54 Sup. Ct. 505, 78 L. ed. 940, 89 A. L. R. 1469; *Falco v. Atlantic City,* 99 N. J. L. 19, 122 Atl. 610; *Wilson v. City of Zanesville,* 130 Ohio St. 286, 199 N. E. 187, 189; *Feldman v. Cincinnati,* 20 Fed. Supp. 531.

The suggestion urged that this statute is discriminatory because it has not been extended to beauty parlors is successfully answered by the fact that those places are given a separate classification and are fully covered and dealt with by the cosmeticians statute (secs. 53–1201 to 53–1226). It will be seen that the statute provides for the registration and licensing of cosmeticians and goes into great detail as to their requirements as to education, training and qualifications. There seems little room for doubt but that there is a clear line of demarcation between what is referred to in the statute under consideration as a barber shop, and the business of operating a beauty parlor as contemplated by the cosmeticians statutes. (*McDermott v. City of Seattle*, 4 Fed. Supp. 855.)

It is argued that, ''A barber's working hours can be effectually regulated, without closing the shop in which he works, by an ordinance specifically designating his hours of work. To close the shop, therefore, in order to prevent overwork by barbers therein, unnecessarily interferes with its operation, and is unreasonable.'' (*Knight v. Johns*, 161 Miss. 519, 137 So. 509.) The fallacy of this seems to lie in the holding that the ordinance might properly regulate the *hours of work* and still may *not require* the place where the work is done *closed* for any period of time. If the working hours may be prescribed, then there certainly can be no valid, constitutional objection to closing the shop at the conclusions of working hours.

The owner's property right in the building can certainly be no more valuable nor sacred under the constitution than his right to labor. In other words, the property right of a man to work and to reap the earnings of his labor is equally as sacred under the constitution as the property right of the man who owns the building in which the laborer works. Municipal ordinances and legislation regulating the hours of work have been almost uniformly recognized in the decisions of the courts ever since the decision of the Supreme Court of the United States in *Barbier v. Connolly*, 113 U. S. 27, 5 Sup. Ct. 357, 28 L. ed. 923, and *Soon Hing v. Crowley*, 113 U. S. 703, 5 Sup. Ct. 730, 28 L. ed. 1145. In the latter case Mr.

Justice Field, speaking for the Supreme Court of the United States, said:

"However broad the right of every one to follow such calling and employ his time as he may judge most conducive to his interests, it must be exercised subject to such general rules as are adopted by society for the common welfare. All sorts of restrictions are imposed upon the actions of men, notwithstanding the liberty which is guaranteed to each. It is liberty regulated by just and impartial laws. Parties, for example, are free to make any contracts they choose for a lawful purpose, but society says what contracts shall be in writing and what may be verbally made, and on what days they may be executed, and how long they may be enforced if their terms are not complied with. So, too, with the hours of labor. On few subjects has there been more regulation. How many hours shall constitute a day's work in the absence of contract, at what time shops in our cities shall close at night, are constant subjects of legislation."

The contention, that the hours of work may be limited but the place of work cannot be closed, may be sound policy and political argument to urge upon a legislature in a state where there are large cities and a great diversity of occupations, and varied amusements for the idle, and those who remain up of nights and sleep in the daytime; and where a considerable portion of the population are up and about at all hours of the night, and no doubt need the attention of a barber, and sometimes perhaps a nurse and a doctor before morning. Fortunately that condition does not prevail in Idaho and such argument would probably have very little influence on an Idaho legislature. Here, perhaps, the majority shave themselves and the others find plenty of time to get a shave and hair cut before 7 o'clock in the evening. No doubt when Boise or any other of our urban communities grows to the proportions of a New York, Chicago, or even San Francisco, the members of the legislature, who, by the way, are not as dumb as some people would have us believe, will in their discretion amend the law and allow these artists possibly to remain open all night and run in shifts; but that eventful day has not yet come upon us.

Furthermore, we cannot close our eyes to what everyone else knows, namely, that those who run barber shops are in competition with each other for business just as other business concerns, and in order that each may establish a trade and retain his customers, each is entitled to the assurance that the other will close his business at a fixed time. Such a requirement not only provides for the rest and recreation of the employees, and cleaning and inspecting the shop, but it also serves the general welfare in regulating the time of conducting the business. (*State v. Dolan,* 13 Ida. 693, 715, 92 Pac. 995, 14 L. R. A., N. S., 1259.) A very interesting discussion of both sides of this question is to be found in *Patton v. City of Bellingham,* 179 Wash. 566, 38 Pac. (2d) 364, 98 A. L. R. 1076.

We are not advised as to just what particular reasons prompted the legislature to enact this statute except as recited in the act itself; and we cannot forget that the law makers had a right to act upon any constitutional reason within the realm of the public health, morals, safety, or general welfare in the passage of this act. Among the many reasons that have been suggested for such legislation, there is one that requires no speculation in this state but has found its way into the records of this court, and that is: Some of the less scrupulous and cautious members of those engaged in the barbering business have allowed their places to be used as meeting places, where back rooms have been turned into rendezvous for illicit use of intoxicants and immoral conduct. (See *State v. Parris,* 55 Ida. 506, 44 Pac. (2d) 1118; *State v. Paris,* 58 Ida. 315, 72 Pac. (2d) 865.) The closing of such shops at nighttime is distinctly within the police power of the legislature; and it often happens that in order to regulate the business and conduct of those who would violate the customs of right and decency, it becomes necessary to extend the same rule to all and thus include those who need no restraints.

We should not conclude this opinion without calling attention to the fact that this statute (sec. 53–704) has been on the book for 20 years, and during all that time no amendment or change has been made by the legislature. It is also urged that the statute (sec. 53–704), is void because it does

not fix any hour for *opening* shops; it only fixes the hour (7 P. M.) for *closing the shop and quitting work for that day.* We do not think this is a valid objection, for the reason that the statute forbids keeping "open for business or to work at the barber's trade . . . . *after* the hour of seven o'clock P. M. on any working day." That would clearly prevent opening of the shop before midnight. As hereinbefore mentioned, the conditions of society and extent of our population are such that there is no likelihood or probability of one, who had to close his shop at 7 P. M., and keep it closed until midnight, having occasion to reopen it again until we denizens awake in the morning.

 I find no valid reason for holding the legislative act or the ordinance unconstitutional. A majority of my associates, however, entertain a different view as to the legislative act, sec. 53–704, and hold it unconstitutional.

The judgment is therefore affirmed in so far as it enjoins prosecutions under sec. 53–704, I. C. A., and reversed in so far as it enjoins prosecutions under Ordinance No. 1704 of the City of Boise. No costs awarded.

Holden, J., concurs in holding both the statute and the ordinance valid.

GIVENS, J., Concurring in Part and Dissenting in Part.— I concur with the conclusion of Ailshie, C. J., that the ordinance is constitutional, but otherwise dissent and believe and hold the statute to be unconstitutional.

BUDGE, J., Dissenting.—There appears little room for argument that professions, trades, callings, or occupations, which because of their intimate relation to public health, including the occupation of barber, may be regulated by legislative act, and municipal ordinance when such power has been granted the municipality, under the police power, enabling the state or such municipality to make needful rules and regulations for the health, safety and welfare of the public. Neither the legislature nor municipal authority can, however, under guise of police power, impose upon barber shops unreasonable, capricious, or arbitrary regula-

tions having no relation to the public health or welfare. (7 American Jurisprudence, pp. 613, 614, secs. 2, 3, 7; *Patton v. Bellingham,* 179 Wash. 566, 38 Pac. (2d) 364, 98 A. L. R. 1076; *Chaires v. Atlanta,* 164 Ga. 755, 139 S. E. 559, 55 A. L. R. 230; *Cooper v. Rollins,* 152 Ga. 588, 110 S. E. 726, 20 A. L. R. 1105; *Moler v. Whisman,* 243 Mo. 571, 147 S. W. 985, Ann. Cas. 1913D, 392, 40 L. R. A., N. S., 629.)

Chapter 7, Title 53, I. C. A. "Barber Shop Inspection and Closing Hours," contains the following provisions:

By section 53–701, I. C. A., the department of public welfare is charged with the sanitary supervision of all barber shops in the state of Idaho in the interest of public health and to prevent the spread of contagious and infectious diseases. Section 53–702, directs the department of public welfare to inspect barber shops as follows:

"The department of public welfare is hereby directed and empowered to inspect the places mentioned in section 53–701, and to make such rules and regulations as are necessary to safeguard the public health, and to prevent the spread of contagious or infectious diseases, which rules and regulations shall be posted and published in the manner provided in section 36–303, and any person violating any such rules or regulations, when so posted and published, shall be guilty of a misdemeanor, and upon conviction shall be fined a sum not to exceed fifty dollars."

Section 53–703 provides:

"*Upon any such establishment herein being found to be in a sanitary condition,* by the department of public welfare, and complying with the regulations provided for in the preceding section, a certificate shall be issued by said department, without any cost, good for the year in which it is issued, which shall be kept posted in a conspicuous place. The owner, lessee, or manager of any barber shop . . . . who operates his business in violation of this provision shall be guilty of a misdemeanor, and punished as provided in the preceding section."

Section 53–704, that directly involved herein, provides:

"It shall be unlawful for any person or persons in the state to keep open for business or to work at the barber's

trade in any city of the *first or second class* after the hour of seven o'clock P. M. on any working day; provided, however, that on Saturday and the day preceding each legal holiday said barber shops may be kept open for business until ten o'clock P. M."

Section 9 of Ordinance 1704 of the City of Boise provides to similar effect but with certain dissimilarities, as follows:

"It shall be unlawful for any person or persons, firm or corporation, to operate, maintain, or conduct, any barber shop or place wherein barbering is done, in Boise City, Idaho, to be open for the purpose of business of barbering for revenue, pay, free or otherwise, before eight o'clock A. M. and after six o'clock P. M. on the following days. . . . . (Monday to Friday, incl.) on Saturday of each week said shops or places shall not be open before eight o'clock A. M. or after seven o'clock P. M.

"All barber shops shall remain closed on Sunday and the following holidays to wit: New Years Day, Decoration Day, Fourth of July, Labor Day, Armistice Day, Thanksgiving Day, and Christmas, and when said holidays or any of them fall on Sundays, then the following Monday shall be observed."

From the foregoing statutes and the ordinance it appears that although the owner or proprietor of a barber shop in a city of the first or second class conducts his shop in a clean and orderly manner, complying with the rules and regulations necessary to safeguard the public health, but allows his shop to remain open for business after the hour prescribed, in the case of the statute, or open his shop earlier or permits it to remain open later than the hours prescribed, in the case of the ordinance, he is subject to prosecution. Barber shops or the barber trade may be operated or carried on in all towns, villages or hamlets, other than cities of the first or second class, without restriction as to the hours of opening or closing.

It is not contended that the ordinance is invalid in requiring barber shops to be closed on Sunday. I think it may be conceded that statutes or ordinances prohibiting barbers from keeping their shops open or working at the barber's trade on Sunday is a legitimate exercise of the police power.

(*Re Caldwell,* 82 Neb. 544, 118 N. W. 133; *Ex parte Kennedy,* 42 Tex. Crim. 148, 58 S. W. 129, 51 L. R. A. 270; *Stark v. Backus,* 140 Wis. 557, 123 N. W. 98; cases cited in note 20 A. L. R., p. 1114.)

The issue presented is the reasonableness of the provisions of the statute and ordinance in prescribing the hours at which barber shops may open and when they must close. Police regulation of the use or enjoyment of property rights and the right to labor can only be justified by the presence of public interest. The right to acquire and own property and deal with and use it as one chooses and the right to labor as one will, so long as the use or the exercise of the right harms nobody, is a natural right to which the police power is subordinate. The right may be limited only to the extent necessary to subserve the public interest. Therefore, the owner or the laborer has the constitutional right to make any use of his property or his labor as he desires *so long as he does not interfere with or threaten the safety, health, comfort or general welfare of the public.* Can it be logically contended that the closing of a barber shop, where a lawful and legitimate business is being conducted, inures to the public safety, health, or general welfare? Is it necessary to close a legitimate place of business to insure the safety, health, or general welfare of the public? The question, simply states, is: Does the law have a real or substantial relation to the public interest in the matter regulated. (*Mugler v. Kansas,* 123 U. S. 623, 661, 8 Sup. Ct. 273, 31 L. ed. 205.)

It may be conceded, frankly, that the validity of an ordinance establishing a closing hour for barber shops has been sustained. (*Falco v. Atlantic City,* 99 N. J. L. 19, 122 Atl. 610.) The majority of the cases directly considering such question, however, have reached the opposite conclusion, the well founded statement in 7 American Jurisprudence, page 617, section 8, stating:

"The majority of the cases which have considered the validity of ordinances containing provisions requiring barber shops to be closed at a certain fixed time on secular days have reached the conclusion that such provisions have no reasonable relation to the admittedly proper exercise of

the police power in regulating the profession of barbering. Any such regulations depend for their validity upon the nature of the business sought to be regulated; that is, the nature of the business must be such that the public health, morals, safety, or general welfare is, or might be, affected by such business being permitted to remain open or continue after certain hours. With regard to barber shops, such a regulation bears no reasonable relation to the public health or general welfare; nor can it be supported on the theory that it will aid the enforcement of proper inspection regulations."

Conceding that under the exercise of the police power the state or city may regulate the hours and conditions of labor with respect to barbers it cannot be logically contended that the ordinance or the statute by their terms attempt to limit the hours of labor, but merely dictate the hours which barber shops must remain closed. The owner, lessee or manager of such business is prohibited from carrying on a properly conducted, legitimate, lawful, and well-nigh indispensable business except within designated arbitrary hours. Obviously the working hours of barbers can be effectually regulated by ordinance or statute specifically designating their hours of work and without closing the shop.

"A barber's working hours can be effectually regulated, without closing the shop in which he works, by an ordinance specifically designating his hours of work. To close the shop, therefore, in order to prevent overwork by barbers therein, unnecessarily interferes with its operation, and is unreasonable." (*Knight v. Johns,* 161 Miss. 519, 137 So. 509.)

"It is contended by respondents that it is necessary to limit the hours that a barber may labor, in order to prevent fatigue with its consequent hazards to the general public. It will be observed that the ordinance does not by its terms limit the hours of labor at all, but merely attempts to limit the time within which a shop may be kept open. If a shop remained open twenty hours of the day, working two shifts of ten hours each, or kept open twenty-four hours of the day, working three shifts of eight hours

each, or four shifts of six hours each, there would be no violation of any regulation as to the hours of labor.'' (*Patton v. Bellingham, supra.*)

The contention in the majority opinion that closing of a barber shop at a specified hour is no different in principle than regulating the hours a barber may work is not based upon sound logic. Several barbers may work in one shop, the hours of each individual may be regulated as to length of time, yet by working in shifts or at different periods of time continuous operation of the barber shop would be possible without requiring any barber to work longer hours than he was by law permitted. To arbitrarily close barber shops at a specified hour tends to limit the hours of labor of barbers as a class while to regulate the hour of the individual barber and permit barber shops to remain open extends the hours of labor of barbers as a class.

It will be noted that section 53–704, I. C. A., provides it shall be unlawful for any person or persons in the state to work at the barber's trade in any city of the first class or second class after the hour of 7 o'clock P. M., thus denying the right of a barber to care for the sick at hospitals, in homes, or elsewhere after 7 o'clock P. M. A violation of such provision would subject a barber to prosecution.

It will be observed that under section 9 of Ordinance 1704 of the City of Boise all barber shops shall remain closed on the Monday following any designated holiday which falls upon Sunday, thus denying to the barber the right to work on a secular day, limiting his earnings whatever his necessities may be and denying him the right to make a livelihood on such days. Such a provision closing barber shops on Monday following the Sunday upon which a holiday falls is arbitrary and unreasonable and bears no relation to the public health, safety or general welfare.

There is no real merit in the contention that the ordinance and statute should be upheld upon the theory that they facilitate adequate inspection, thus inuring to the public health. Certainly opportunity exists without absolute closing of barber shops for reasonable inspection. The following cases have referred to such contention and have reached the

conclusion that inspection does not require, authorize or permit the fixing of arbitrary closing hours.

"It is suggested by respondents in their brief that the closing of the shops at an early hour would facilitate inspection by the authorities and members of the board of inspection. But certainly ample opportunity now exists for reasonable inspection, and certainly the situation does not call for an absolute closing of the shops in order that inspectors may go upon the premises; otherwise the right of inspection would not be an incident of regulation, but would be a lever by means of which the business would be largely controlled.'' (*Patton v. Bellingham, supra.*)

"Another reason given for the validity of the ordinance is, that it is designed to fix a reasonable time within which the city inspectors may inspect barber shops in order to ascertain whether the city's sanitary and health ordinances are there obeyed. . . . . As we understand the argument, the necessity for the barber shop closing ordinance arises because of inconvenience to the city's inspectors of inspecting such shops during the hours the ordinance requires them to be closed. It does not, and could hardly be made to, appear that such inspection must be continuous, covering every hour a barber shop is open; and to compel the closing of barber shops between certain hours, because it will be inconvenient for the city to then inspect them, when they are open at other hours amply sufficient for such inspection, would unnecessarily and unreasonably interfere with the operation thereof.'' (*Knight v. Johns, supra.*)

Fallaciousness of reasoning with reference to the convenience of inspection by reason of such closing provisions is aptly disclosed by the widely divergent argument with respect thereto contained in the two foregoing cases. In the first it was argued that inspection would be facilitated by giving inspectors opportunity to go upon the premises during the hours the shops were closed. In the second case it was urged that inspections must be made when the shops are open and in the absence of closing regulations inspectors were compelled to work long hours, placing too much burden on the inspectors.

"The possible suggested difficulty is that inspectors cannot be on duty at all hours of the night, without placing too great a burden on the municipality. Perhaps, to those who are familiar with the times and methods of inspecting barber shops, this reason would seem absurd. If, for instance, in the administration of such an ordinance an inspection is made of each shop once a month, once a week, or even once each day, there would seem to be no substantial reason for the claim that the closing of the shops at 6 in the evening was at all necessary to facilitate inspection. . . . . We are not willing to suppose that the absence of closing regulations might render effective inspection impossible. We may grant that it might render it more inconvenient and perhaps more expensive. If that be so, a weighing of the conflicting interest, that of the barber to pursue a useful occupation so long as he complies with the sanitary regulations, and that of the public to have the shop inspected—makes it reasonable to suppose that the Legislature, in granting the power to license and regulate without mention of the inconvenience and expense of inspection, if not covered by the license fees, should be borne by the public, instead of intending, that the city authorities should fix an arbitrary closing hour." (*State v. City of Laramie*, 40 Wyo. 74, 275 Pac. 106.)

An examination of the authorities will disclose that a majority of the cases which have considered the validity of statutes or ordinances containing provisions fixing the hours within which barber shops may be open for business have reached the conclusion, upon various grounds, that such provisions are an unconstitutional invasion of the right to earn a living, and consequently a denial of due process, having no reasonable relation to the admittedly proper exercise of the police power in regulating such profession.

"The occupation of barbering is a lawful business, and, so far from being an obnoxious one, it is now considered well-nigh indispensable. It may be conceded, as we have already conceded, that its relation to the public is such as to render it amenable to proper regulation, to the end that the public may be protected against the spread of communicable diseases and unsanitary practices. In so far as

the ordinance seeks to require that such shops shall be operated in a clean and sanitary manner, and by clean and competent barbers, it is a wholesome measure and a valid exercise of the police power. But, in our opinion, the avowed object of the ordinance bears no real or substantial relation to the reasonable protection of the public. It belongs rather, in the category of unreasonable restrictions upon the right of a citizen to engage in a useful and lawful calling and to acquire and possess property and to so use it as will not interfere with the rights of others. The ordinance seeks not merely to regulate a business, but to dictate its operation.'' (*Patton v. Bellingham, supra; Knight v. Johns, supra; State v. Laramie, supra.*)

''In fact, the business may be regarded as indispensable in the present development of our civilization, if we have regard to the requirements of decency and cleanliness. . . . . And in addition to this, those engaged in domestic service and in the various branches of such service are detained. in the discharge of their duties in this employment to an hour that would prevent their availing themselves of the service rendered in barber shops, if such shops are closed at the hour of 7 o'clock. The section of the ordinance with which we are now dealing is therefore void, as being unreasonable, upon the ground which we have stated above, and other grounds could be adduced if necessary. And it is discriminatory because it selects one particular lawful business that is in no wise obnoxious, and requires those operating this business to close at a very early hour, but leaves unregulated as to hours of closing various other businesses.'' (*Chaires v. Atlanta,* 164 Ga. 755, 139 S. E. 559, 55 A. L. R. 230.)

''A statute prohibiting barbers to carry on business after 12 o'clock on Sunday or on a legal holiday, and applying to no other class of labor is unconstitutional as special, unjust, and unreasonable, working an invasion of individual liberty, since it is based upon no distinction to justify singling out that class of laborers. . . . . The laboring barber, engaged in a most respectable, useful, and cleanly pursuit, is singled out from the thousands of his fellows in other employments, and told that, willy nilly, he shall not

work upon holidays, and Sundays after 12 o'clock noon. His wishes, tastes, or necessities are not consulted. If he labors, he is a criminal. Such protection to labor carried a little further would send him from the jail to the poorhouse.'' (*Ex parte Jentzsch,* 112 Cal. 468, 44 Pac. 803, 32 L. R. A. 664.)

In *Brown v. City of Seattle,* 150 Wash. 203, 272 Pac. 517, 278 Pac. 1022, it was held an ordinance purporting to make it unlawful for any shop conducted for the sale of meat and meat products to keep open for business after 6 o'clock in the afternoon, was an unconstitutional exercise of police power, not tending in practical manner to prevent sale to the public of unwholesome meat.

If it is lawful to permit barber shops to remain open continuously in larger cities than we have in Idaho as is apparently conceded in the majority opinion, can it be logically contended that in Idaho cities of the first and second class of lesser population may be arbitrarily closed during certain hours?

If the statute and ordinance above referred to regulated the hours of labor of the individual barber we would have an entirely different question, but they do nothing of the kind but to the contrary simply padlock a legitimate place of business depriving the owner, lessee or proprietor of the right to the use of property without due process of law and are therefore in my opinion unreasonable and void.

Dereliction in the conduct of one or more barbers by permitting liquor to be sold in their places of business or permitting other violations of law or good morals would not justify the conclusion that in the interest of public health, public morals or general welfare that all barber shops should be closed at an arbitrary hour. I think it will be conceded that places other than barber shops have been more derelict. Dereliction of this kind in isolated cases may be found in practically all lines of business.

The judgment of the trial court should be sustained.

MORGAN, J., Dissenting.—The sole question presented for our consideration is as to the validity of the ordinance and statute quoted in the foregoing opinions. Appellant

contends these enactments are a proper exercise of the police power of the state and respondents contend they violate article 1, section 13, of the Constitution of Idaho, wherein it is provided that no person shall be deprived of liberty or property without due process of law, and the Fourteenth Amendment to the Constitution of the United States which prohibits the state from depriving any person of liberty, or property, without due process of law.

The police power was discussed in *In re Crane,* 27 Ida. 671, 151 Pac. 1006, L. R. A. 1918A, 942. Therein we said:

"No fixed rule has been discovered by which to determine whether or not a statute of the nature of the one under consideration is a proper exercise of the police power, but it may be said the questions propounded to the courts are: Does the statute purport to have been enacted to protect the public health, the public morals, or the public safety? Has it a real and substantial relation to those objects, or is it, upon the other hand, a palpable invasion of rights secured by the constitution? Questions as to the wisdom and expediency of such legislation address themselves to the legislative, not to the judicial branch of the government."

In that case we quoted from the opinion delivered by Justice Harlan in *Mugler v. Kansas,* 123 U. S. 623, 8 Sup. Ct. 273, 31 L. ed. 205, as follows:

"But by whom, or by what authority, is it to be determined whether the manufacture of particular articles of drink either for general use or for the personal use of the maker, will injuriously affect the public? Power to determine such questions, so as to bind all, must exist somewhere; else society will be at the mercy of the few, who, regarding only their own appetites or passions, may be willing to imperil the peace and security of the many, provided only they are permitted to do as they please. Under our system that power is lodged with the legislative branch of the government. It belongs to that department to exert what are known as the police powers of the state, and to determine, primarily, what measures are appropriate or needful for the protection of the public morals, the public health or the public safety.

"It does not at all follow that every statute enacted ostensibly for the promotion of these ends is to be accepted as a legitimate exertion of the police powers of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. While every possible presumption is to be indulged in favor of the validity of the statute, *Sinking Fund Cases*, 99 U. S. 700, 718, 25 L. ed. 496, 501, the courts must obey the constitution rather than the law-making department of government, and must, upon their own responsibility, determine whether, in any particular case, these limits have been passed. 'To what purpose,' it was said in *Marbury v. Madison*, 5 U. S. (1 Cranch.) 137, 167, 2 L. ed. 60, 70, 'are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? The distinction between a government with limited and unlimited powers is abolished, if those limits do not confine the persons on whom they are imposed, and if acts prohibited and acts allowed are of equal obligation.' The courts are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority. If, therefore, a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution."

The Supreme Court of the United States in *Lawton v. Steele*, 152 U. S. 133, 14 Sup. Ct. 499, 38 L. ed. 385, said, with respect to the police power:

"To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The legislature may not, under the guise of protecting the

public interests arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts.''

The Supreme Court of Wyoming, in *State v. City of Sheridan,* 25 Wyo. 347, 170 Pac. 1, 3, 1 A. L. R. 955, quoted from Adam Smith's Wealth of Nations, Book I, chapter 10, as follows:

''It has been well said that, 'The property which every man has in his own labor, as it is the original foundation of all other property, so it is the most sacred and inviolable. The patrimony of the poor man lies in the strength and dexterity of his own hands, and to hinder his employing this strength and dexterity in what manner he thinks proper, without injury to his neighbor, is a plain violation of this most sacred property. It is a manifest encroachment upon the just liberty both of the workman and of those who might be disposed to employ him. As it hinders the one from working at what he thinks proper, so it hinders the others from employing whom they think proper.' ''

The business of the barber, properly conducted, is in no sense a menace to public health, public morals or public safety. It may be, and in this state it has been, regulated so as to safeguard the public health and to prevent the spread of contagious or infectious diseases by improper or unsanitary practices. (I. C. A., Title 53, chap. 6 and secs. 53–701, 53–702, 53–703.) The lessening of the hours during which barber shops may be kept open would not assist in improving sanitary conditions therein.

It has been urged that the closing of shops, in conformity to the statute and ordinance here under consideration, would aid in sanitation inspection. In what way inspection would be promoted by shortening the hours during which the shops might be kept open is not apparent. (*Ernesti v. City of Grand Island,* 125 Neb. 688, 251 N. W. 899.)

The following statement by the Supreme Court of Louisiana in *City of Alexandria v. Hall,* 171 La. 595, 131 So. 722, 724, applies to this case:

"Besides, the requirement in the ordinance that barber shops shall be closed at 6:30 p. m. throughout the year, with certain exceptions, is not really an appropriate measure for the protection of the public health, as the alleged necessity for the restriction in the ordinance bears no reasonable relation to public health, is not supported by anything of substance, but rests, in our opinion, upon mere conjecture. . . . .

"A minority of 20 per cent. of the barbers in the city of Alexandria are opposed to the ordinance in question. The clear purpose of the ordinance is to make all barbers close their shops at the same time. No thought of the health of the community, in our opinion, was in the minds of the barbers or of the city council, when section 4 was written into the ordinance, closing all the barber shops during the week days at 6:30 p. m., except on Saturdays, when they must be closed at 9 o'clock p. m. Besides, adequate health provisions are taken care of in the uncontested provisions of the ordinance."

(See, also, *Ganley v. Claeys,* 2 Cal. (2d) 266, 40 Pac. (2d) 817; *Ex parte Kazas,* 22 Cal. App. (2d) 161, 70 Pac. (2d) 962; *Chaires v. City of Atlanta,* 164 Ga. 755, 139 S. E. 559, 55 A. L. R. 230; *Saville v. Corless,* 46 Utah, 495, 151 Pac. 51, Ann. Cas. 1918D, 198, L. R. A. 1916A, 651; *Patton v. City of Bellingham,* 179 Wash. 566, 38 Pac. (2d) 364, 98 A. L. R. 1076.)

The Chief Justice says in his opinion:

"Among the many reasons that have been suggested for such legislation, there is one that requires no speculation in this state but has found its way into the records of this court, and that is: Some of the less scrupulous and cautious members of those engaged in the barbering business have allowed their places to be used as meeting places, where back rooms have been turned into rendezvous for illicit use of intoxicants and immoral conduct. (See *State v. Parris,* 55 Ida. 506, 44 Pac. (2d) 1118; *State v. Paris,* 58 Ida. 315, 72 Pac. (2d) 865.)"

Although the name is not spelled alike in the two cases, the appellant in each case is the same person, and the legislation in question could not have been prompted by his mis-

conduct. The statute under consideration was enacted in 1919 and the crime of which Parris was convicted, according to the evidence introduced at his trial, was committed on or about July 27, 1933. The closing hours prescribed in the legislation here under consideration not only did not prevent that crime, but can have no tendency to prevent other like offenses. The way cases of that kind should be handled. is the way that one was handled, as is shown by *State v. Paris,* 58 Ida. 315, 72 Pac. (2d) 865, which was an appeal from a conviction of practicing barbering without a certificate of registration.

Sec. 53–615 provides for refusal to issue or renew, and for the suspension or revocation of certificates of registration for the causes therein set forth, among which is, "Conviction of a felony shown by a certified copy of the record of the court of conviction." The record in that case shows appellant's certificate of registration was cancelled because of his conviction of the felony of which he was accused in the case reported in 55 Ida. 506, 44 Pac. (2d) 1118.

The legislation here under consideration is not a proper exercise of the police power. Its purpose is not to protect the public health, the public morals or the public safety, but is to deprive barbers, unnecessarily and unreasonably, of the right to properly conduct their businesses as they see fit, and to the satisfaction of those who employ them.

The judgment appealed from should be affirmed in its entirety.